United States District Court
Southern District of Texas
**ENTERED**
July 19, 2018
David J. Bradley, Clerk

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| **ABEL JAIMES SANCHEZ,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | **CIVIL ACTION NO. 7:17-CV-0366** |
| v. | § | |
| | § | |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | | |
| **Correctional Institutions Division,** | | |
| | | |
| **Respondent.** | | |

### REPORT & RECOMMENDATION

Petitioner, Abel Jaimes Sanchez, a Texas prisoner proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. No. 1). On February 9, 2018, Respondent filed a motion for summary judgment. (Dkt. No. 8). Petitioner has filed a response to the motion for summary judgment. (Dkt. No. 12).

This case was referred to the undersigned United States Magistrate Judge for report and recommendation. After a careful review of the record and relevant law, the undersigned has determined that all of Petitioner's claims are without merit. The undersigned recommends that Movant's § 2254 motion (Dkt. No. 1) be **DENIED** and Respondent's motion for summary judgment (Dkt. No. 8) be **GRANTED**. It is further recommended that Movant's § 2254 motion be **DISMISSED** with prejudice and the case be closed.

### BACKGROUND AND PROCEDURAL HISTORY

By indictment filed July 30, 2014, the state of Texas charged Petitioner with intentionally or knowingly causing the death of an individual (murder). (Dkt. No. 7-10 at 19). On September 8, 2015, Petitioner pleaded guilty to first degree murder. (Dkt. No. 7-12 at 71 ("Waiver of Rights & Consent to Stipulation of Evidence and/or Testimony & Plea of Guilty or No

Contest")).  Petitioner was sentenced to forty-five years of imprisonment.  (Dkt. No. 7-12 at 80 ("Judgment of Conviction by Court & Sentence to the Institutional Division of the Texas Department of Criminal Justice")).  Petitioner did not file a direct appeal.  (Dkt. No. 1 at 3).

On or about April 25, 2016, Petitioner filed a habeas corpus petition with the Texas Court of Criminal Appeals (Appellate Case No. WR-85, 182-01) alleging four grounds: (1) ineffective assistance of counsel, (2) violations of the Fifth and Fourteenth Amendments, (3) spoliation of material evidence, and (4) the court's failure to include lesser offenses.  (Dkt. No. 7-14 at 30-63). The Court of Criminal Appeals subsequently found that additional fact finding was needed to fully evaluate Petitioner's ineffective assistance of counsel claim.  On October 5, 2016, the Court of Criminal Appeals ordered the trial court to make additional findings of fact and conclusions of law regarding the ineffectiveness claim.  (Dkt. No. 7-16).

The State and Mr. Lopez (Petitioner's trial counsel) supplemented the record.  The Petitioner filed a motion asking for leave to amend his habeas petition.  (Dkt. No. 7-5).  This motion was denied on March 9, 2017.  (*Id.*).  On March 24, 2017, the trial court entered an order with additional findings of fact and conclusions of law.  (Dkt. No. 7-9 at 37-41).  On March 29, 2017, the Texas appellate court denied Petitioner's habeas corpus petition without written order. (Dkt. No. 7-1).  Petitioner filed a motion for rehearing.  (Dkt. No. 7-4).  On May 10, 2017, Petitioner's motion for rehearing was denied.  (*Id.*).

On August 28, 2017,[1] Petitioner timely filed the instant § 2554 motion.  Petitioner is scheduled to be released from the custody of the Texas Department of Criminal Justice on June 5, 2059.

---

[1] "[P]ro se prisoners' filings are governed by the mailbox rule.  Thus, they are deemed 'filed as soon as the pleadings have been deposited into the prison mail system.' " *Medley v. Thaler*, 660 F.3d 833, 835 (5th Cir. 2011).  This date is taken from Movant's "Certificate of Service," where he states under the penalty of perjury that his motion was placed in the prison mailbox. (Dkt. No. 1 at 10).

## SUMMARY OF THE PLEADINGS

The undersigned construes that Petitioner raises five grounds in his § 2254 motion:

(1) trial counsel was ineffective for failing to investigate a second ballistics report;

(2) Petitioner's plea was not knowing, voluntary, or intelligent;

(3) trial counsel was ineffective for failing to hire an expert witness to refute the state's pathology report;

(4) trial counsel was ineffective for failing to interview a key witness; and

(5) the trial court denied his request for new counsel.

(Dkt. No. 1).

Petitioner states that after his guilty plea, Petitioner requested his case file from his attorneys. (Dkt. No. 1-1 at 2).  Mr. Reyna, his first attorney, responded and provided Petitioner with a complete case file.  (*Id.*).  Petitioner states that in reviewing his case file, he discovered for the first time that two ballistics reports existed—one which supported the state's case and one which supported Petitioner's version of events.  (*Id.*).  Petitioner argues his second attorney, Mr. Lopez, was ineffective because he never "considered" or "investigated" the ballistics report, and "simply ignored" the report.  (*Id.* at 4).

Related to the first claim, Petitioner asserts that his guilty plea was not knowing, voluntary, or intelligent because Petitioner did not know of the second ballistics report at the time of his plea.  (Dkt. No. 1 at 7; Dkt. No. 1-1 at 4).  Petitioner states counsel's actions were such an "egregious mistake" that "this issue, alone, destroys the validity of the guilty plea." (Dkt. No. 1-1 at 4).  Petitioner argues that, had his trial counsel informed him of the second ballistics report or not "hid this report" from Petitioner, Petitioner never would have pled guilty and would have proceeded to trial.  (*Id.* at 4-5).

Petitioner argues that Mr. Lopez was additionally ineffective for failing to hire or consult an expert witness regarding the two ballistics reports, the autopsy, the trajectory of the bullet, and a toxicology report on the deceased. (*Id.* at 7).

Petitioner further states that Mr. Lopez failed to interview the victim's sister, Yessica Ramos. (*Id.* at 12). Petitioner asserts that Yessica Ramos was a key witness, and that the sheriff's department manipulated her into changing her statement, resulting in Yessica Ramos giving two conflicting statements—one stating Daniela's last words were "me di" ("I shot [did it to] myself") and one stating Daniela's last words were "mi dio" ("he shot [did it to] me"). (Dkt. No. 1-1 at 12-13). Petitioner contends that, had Mr. Lopez investigated Yessica Ramos's two conflicting statements, Petitioner would not have pled guilty and insisted on going to trial. (*Id.* at 14). Petitioner additionally asserts that by doing so Mr. Lopez could have sought a better plea bargain. (*Id.*).

Petitioner further states that he requested new counsel on the day he plead guilty and the court denied his request. (*Id.* at 15). He asserts that the state court's denial is a violation of his Fifth and Sixth amendment rights and his right to counsel of his choice. (*Id.*). Petitioner asserts that the court failed to follow the factors from *Cobb v. Warden*, 466 F. App'x 456, 460 (6th Cir. 2012).

Finally, Petitioner seeks to have his guilty plea withdrawn and a new trial granted. (*Id.* at 16).

The government submits that Petitioner's claims are procedurally barred because Petitioner has not exhausted state remedies and that the remaining claims are without merit. (Dkt. No 8 at 1). Petitioner did not raise a claim that trial counsel was ineffective for failing to hire an expert witness, a claim alleging failure to investigate the two ballistics reports, or a claim

relating to the court's denial of his request for new counsel in his state habeas petition. (*Id.* at 6-7). While Petitioner's first state habeas claim involves a general allegation that counsel failed to investigate, he did not raise the same theories of failing to investigate or consider the ballistic report that he relies on in his federal habeas petition. (*Id.* at 6).

The government additionally states that Petitioner's guilty plea was knowing, intelligent, and voluntary based on the record showing that the trial court admonished Petitioner of offense he was charged with and the punishment range. (*Id.* at 13). Petitioner also signed multiple written admonishments, stating that he understood his rights and waived them. (*Id.* at 14-15). After being admonished, Petitioner pleaded guilty. (*Id.*). The government argues that Petitioner has not overcome the presumption of veracity carried by his sworn statements in open court. (*Id.*).

In his response, Petitioner asserts that his claims are not procedurally barred because he had no counsel at the state habeas stage, citing to *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Martinez v. Ryan*, 566 U.S. 1 (2012). (Dkt. No. 12 at 1). He additionally asserts that his claims are not procedurally barred because he either did raise these issues in his state habeas petition or that they "link back" to his IAC claim in his state petition. (*Id.* at 2).

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254, as amended by the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody. Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The state court's factual findings are entitled to a presumption of correctness, and to rebut that presumption, Petitioner must show by clear and convincing evidence that the state court determinations are not fairly supported by the record. *See* 28 U.S.C. § 2254(e)(1). This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b). In order for remedies to be exhausted, a petitioner must have given the state courts an opportunity to address his federal claim. *Id.* A petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995). "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6 (1982) (citations omitted). If a petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which bars federal habeas review "unless the

prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

For claims of ineffective assistance of counsel (IAC), the United States Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To demonstrate deficient performance a "defendant must show that counsel's performance fell below an objective standard of reasonableness." *Id.* at 688. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013). The court will not second-guess strategic decisions or fault the attorney for deviations from best practices. *Premo v. Moore*, 862 U.S. 115, 121 (2011). Rather, the court looks to whether the attorney was incompetent under "prevailing professional norms." *Id.* Federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Id.* at 13. The court should be highly deferential to strategic decisions. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993). The reasonableness of counsel's conduct must be viewed as of the time of counsel's conduct. *See Maryland v. Kulbicki*, 136 S. Ct. 2, 4 (2015).

To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  To show prejudice related to a guilty plea, a petitioner must affirmatively prove that, but for his counsel's errors, he would have not pleaded guilty and would have insisted upon going to trial.  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Armstead v. Scott*, 37 F. 3d 202, 206 (1994).   A petitioner must show that going to trial would have given him a reasonable chance of a *more favorable* result.  *United States v. Batamula*, 823 F.3d 237, 540 (5th Cir. 2016).

The court must construe a pro se petitioner's pleadings liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  At the same time, a petitioner must still plead sufficient facts to support his claims that extend beyond mere conclusory allegations.  *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993).

### **Procedural Default**

Petitioner raises four IAC claims not presented in his state habeas petition.  Petitioner asserts he is not procedurally barred, citing *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Martinez v. Ryan*, 566 U.S. 1 (2012).  Essentially, because he had no counsel at the state habeas phase (proceeding pro se), Petitioner asserts that this should be "cause" for the default.  *Trevino* held that a federal court can find "cause" to excuse a procedural default where (1) the underlying IAC claim was "substantial," (2) the cause consisted of there being "no counsel" or "ineffective" counsel during the state collateral review, (3) the state collateral review proceeding was the initial review proceeding for the IAC claim, and (4) state law requires that the IAC claim be raised in an initial collateral review petition.  569 U.S. at 423.  Petitioner would not be able to proceed past the first prong on any of his claims.  Evaluating whether the underlying IAC claims are "substantial" as part of the cause-and-default evaluation involves evaluating whether the

claims "ha[ve] some merit." *Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013). The undersigned finds that all of Petitioner's IAC claims are more than unsubstantial. Petitioner's claims not only remain procedurally barred, but also fail on their merits, as described below.

## ANALYSIS

### I.   Ineffective Assistance for Failure to Investigate Second Ballistics Report

Petitioner alleges that trial counsel was ineffective for failing to investigate a "second ballistics report." (Dkt. 1-1 at 4-5). Petitioner asserts that the first report "purports that the weapon was not fired as Petitioner claims" and the second report "can substantiate the Petitioner's version of events." (*Id.*). "[The t]wo reports . . . contradict each other. Yet, defense counsel failed to tell the Petitioner about the Bexar [R]eport and much less investigate the Bexar report. Defense counsel simply ignored the Bexar Report and/or hid this report from the Petitioner." (*Id.*). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91.

Petitioner attaches several exhibits to his § 2254 petition. These include an autopsy report; a "firearms/toolmarks laboratory report" from the Texas Department of Public Safety Crime Laboratory dated February 24, 2015; and a "trace evidence report" from the Bexar County Criminal Investigation Laboratory dated March 6, 2015. In the context of Petitioner's argument and his handwritten notes on the exhibits, it appears that the "trace evidence report" from the Bexar County Criminal Investigation Lab is the "second ballistics report" or the "Bexar Report."

While Petitioner's state habeas claim involves a general allegation that counsel failed to investigate, he did not raise the same theory of failing to investigate the second ballistic report that he relies on in his federal habeas petition. In his state habeas petition, Petitioner asserts that his trial counsel was ineffective for failing to investigate "any of the details of [the] case that [Petitioner] point[ed] out to him," coercing him into pleading guilty, failing to discuss any defense strategies, and failing to prepare for trial. (*See* Dkt. No. 7-14 at 36-37, 51-53).

Petitioner states in his § 2254 petition that he initially learned of the second ballistics report when he received his case files in preparing his state habeas petition. (Dkt. No. 1-1 at 2). This indicates that Petitioner had discovered the second ballistics report prior to filing his state habeas petition, but chose not to include this theory of ineffectiveness. It also means that the failure to investigate "details of [the] case that [Petitioner] point[ed] out" to Mr. Lopez—the statement that *was* included in the state habeas petition—could not have possibly referred to the second ballistics report, because Petitioner did not know of the second ballistics report until after his conviction and sentence. The failure-to-investigate claim that Petitioner raised in his state habeas petition and the claim Petitioner raises in his federal habeas petition are distinct claims and thus they cannot "link back" as Petitioner asserts. (Dkt. No. 12 at 2). "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson*, 459 U.S. at 5-6. Petitioner has failed to exhaust state remedies, and therefore this claim is procedurally barred. Even if Petitioner's claim was not procedurally barred, Petitioner would not be able to demonstrate he is entitled to relief, as described below.

While Petitioner did not elaborate on his version of events in his § 2254 petition, his narrative is described in a statement to the police and his state habeas petition. (Dkt. No. 7-10 at

73-75 ("Hidalgo County Sheriff's Office Voluntary Statement of Accused"); Dkt. No. 7-14 at 31-63 ("Application for a Writ of Habeas Corpus Seeking Relief From Final Felony Conviction under Code of Criminal Procedure, Article 11.07")).  Petitioner states that he was talking on the phone outside when Daniela Ramos, his common-law wife, came outside with Petitioner's pistol in her hand. (Dkt. No. 7-10 at 70-73).  She started insulting Petitioner and accusing him of being unfaithful, and threatened to shoot him.  (*Id.*).  Petitioner tried to take the pistol from Daniela, and the two began struggling for the pistol.  (*Id.*).  The pistol went off, shooting Daniela.  (*Id.*).  Petitioner was holding the gun by the grips at this time.  (*Id.*).  Petitioner believes that gunshot residue on the victim's clothing would have demonstrated at trial that the gun was in close range when the shot went off, supporting his version of events. (Dkt. No. 7-14 at 425-26; Dkt. No. 1-1).  Petitioner asserted that he "was only guilty of a charge of . . . manslaughter." (Dkt. No. 7-14 at 36, 63).

The firearms laboratory report indicates that the forensic analyst examined the victim's shirt and not the victim's sports bra. (Dkt. No. 1- 1 at 35).  The forensic analyst examined the shirt visually, microscopically, and chemically for the presence of gunshot residue.  (*Id.*).  No residue patterns were found.  (*Id.*).  The report comes to no determinative conclusion, stating that the lack of residue patterns could have resulted from any number of conditions.  (*Id.*).  The trace evidence report indicates that the forensic analyst examined both the victim's shirt and sports bra using electron microscopy and energy dispersive x-ray analysis.  (*Id.* at 36-37).  The forensic analyst found no gunpowder, soot, bullet wiping, or singeing/burning.  (*Id.*).  The forensic analyst did find "vaporous lead residue" on the sports bra and both "heavy vaporous lead residue" and "light vaporous lead residue" on the victim's shirt.  (*Id.*).  The trace evidence report does not come to a definitive conclusion, stating that the victim's clothing "may" have come into

contact with or was in close proximity to a discharging firearm. (*Id.*). The trace evidence report notes that, if further testing was desired, the known firearm and ammunition should be submitted. (*Id.*).

The reports are not contradictory. Neither of the reports set out a definitive conclusion about the victim's proximity to a discharging firearm. Additionally, it is logical that a preliminary examination using less advanced techniques would not reveal a trace amount of residue, but that one using more advanced scientific techniques could—ostensibly, the purpose of a "trace evidence" report.

While Petitioner alleges that his trial counsel failed to "investigate" the trace evidence report, he does not specifically state what trial counsel failed to do. Petitioner could mean a number of possible things: that trial counsel failed to thoughtfully consider the report as part of a defense strategy, that trial counsel failed to request the state lab to conduct additional testing, that trial counsel failed to consult with an expert witness, or that trial counsel failed to pay for an independent laboratory to conduct another gunpowder residue analysis. Petitioner further states that Mr. Lopez did not consider the report and simply ignored it. (Dkt. No. 1-1 at 4). Petitioner states that Mr. Lopez "never informed Petitioner about such a key piece of evidence." (*Id.* at 2).

Petitioner does not show that Mr. Lopez failed to consider the report or ignored it. Petitioner asserts that Mr. Lopez did not discuss the report with him that he had no knowledge of it, assuming that Mr. Lopez must have "ignored" the report. Petitioner does not show that Mr. Lopez actually did so. Mr. Lopez asserted that he "reviewed, analyzed, and investigated every piece of evidence." (Dkt. No. 7-9 at 21, 25). Mr. Lopez does not mention the ballistics reports specifically, but his affidavit and attached brief were provided in response to Petitioner's state

habeas claim.  Notably, Petitioner's first state habeas claim did not raise the two ballistics reports as an issue, only a general allegation that counsel failed to investigate.

Furthermore, it is Petitioner's burden to demonstrate prejudice by showing how this "investigation" would have changed the outcome.  Petitioner does not show what a further investigation would have concluded.  Mr. Lopez *could* have asked for Petitioner's firearm and his ammunition to be submitted for testing.  But again, it is unknown whether further testing would have concluded anything different than the trace evidence report already does regarding distance.  Plaintiff's argument is that, had counsel investigated the trace evidence report, it would have led to *something* that would have given Petitioner a reasonable probability of achieving a different outcome at trial.  It is Petitioner's burden to show how.  Petitioner only speculates that further investigation would have led to such evidence.

Moreover, Mr. Lopez still could have argued to a jury that there was some corroboration of Petitioner's narrative.  The report already indicates that the victim's clothing "may" have come into contact with or was in close proximity to a discharging firearm.  In this regard, further tests are not needed solely to make the argument.

Even if Mr. Lopez had made such an argument to the jury based on the trace evidence report, Petitioner does not show a reasonable probability of a different outcome, such that the confidence in the outcome is undermined.  There is ample evidence that the victim was shot. (*See* Dkt. No. 1-1 at 32 "Final Autopsy Findings").  The central issue is that, as with most specific intent crimes, there is no direct evidence of intent.  "In prosecutions for crimes . . . which require proof of a specific mental state, direct evidence of the defendant's mental state will be rare indeed.  Thus, it is generally necessary for the trier of fact to reach its conclusion of guilt or innocence based upon the inferences drawn from circumstantial evidence." *United States v.*

*Lowe,* 38 F.3d 570 (5th Cir. 1994). Unlike at the trial phase, where Petitioner has a presumption of innocence when these inferences need be resolved for or against him, a petitioner "comes before the habeas court with a strong—and in the vast majority of cases, conclusive—presumption of guilt." *Bosley v. Cain,* 409 F.3d 657, 664 (5th Cir. 2005); *Schlup v. Delo,* 513 U.S. 298, 326 n.42 (1995). In post-conviction, the burden is squarely on Petitioner—and Petitioner has not met his burden.

The trace evidence report is direct evidence of the fact that there was light and heavy vaporous lead residue present on the victim. From this, a jury may draw a factual finding that the shooting occurred at close range; however, a jury would not be required to make such a finding.[2] "A material fact need not be proved by direct evidence; it is sufficient if there is evidence from which the fact properly can be inferred. When predicate facts are proven and the jury can draw a reasonable inference without resorting to speculation or conjecture, the decision whether to draw the inference is the jury's." 32A C.J.S. Evidence § 1657; *Rideau v. Parkem Indus. Servs., Inc.,* 917 F.2d 892, 897 (5th Cir. 1990) ("A jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict."). An inference can be sufficient proof to overcome other evidence presented. *Pregeant v. Pan Am. World Airways, Inc.,* 762 F.2d 1245, 1250 (5th Cir. 1985).

Even if the jury found that the shooting occurred at close range based on the vaporous residue, the jury then has to make a secondary inference based on the first: finding that the shooting occurred at close range supports Petitioner's version of events involving an accidental discharge, negating the required intent. Again, the jury is not required to draw this conclusion.

---

[2] "[P]ermissive inferences . . . are merely conclusions that can be rationally drawn from any given set of evidence. In determining the facts of a case, the trier of fact must accept some possible inferences and reject others. Whether or not the trier of fact draws a particular inference depends on its assessment of all the evidence-including the credibility of the witnesses-bearing on the issue of fact to be decided." *Reeves v. Gen. Foods Corp.,* 682 F.2d 515, 523 n.9 (5th Cir. 1982) (internal citations omitted).

Notably, while evidence of a close-range shooting could corroborate Petitioner's story of an accidental discharge, it does not preclude a version of events involving an intentional shooting. There is nothing "inherently wrong" with joining two inferences together to reach a conclusion, although "its probability may be attenuated by each underlying inference." *Cora Pub, Inc. v. Cont'l Cas. Co.*, 619 F.2d 482, 486 (5th Cir. 1980). "[E]ven though such criticism does not result in an absolute legal prohibition against piling inference on inference, [the criticism of the practice] stems from the very remoteness of the conclusion from the known facts." *J. C. Penney Co. v. Norris*, 250 F.2d 385, 387 (5th Cir. 1957).

While this argument could have been made at trial, it is still unlikely that Petitioner can show that he would have not pleaded guilty, and there would have been a reasonable probability of a more favorable outcome. *See Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) ("[Defendant] cannot [show prejudice] merely by telling us now that she would have gone to trial then if she had gotten different advice. The test is objective, not subjective[.]"). Thus, while Petitioner is correct that the report can give "credence" to his story, Petitioner overstates the value of the trace evidence report in stating that it "alone, destroys the validity of the guilty plea." (Dkt. No. 1-1 at 4).

Behavior after a crime is also relevant to intent. *See U.S. v. McRae*, 593 F.2d 700, 707-08 (5th Cir. 1979) (defendant charged with murder in the shooting of his wife asserted it had been accidental, testifying to his devotion to her and grief at her death; to rebut this testimony and circumstantially prove state of mind, trial judge properly admitted evidence of defendant's relations with other women within the months after wife's death). In this regard, several witness affidavits describe Petitioner's evasive behavior after the shooting.

Yessica Ramos completed a sworn affidavit the day of the murder. (*See* Dkt. No. 1-1 at 25 ("Affidavit")). She stated that she was home with her sister, Daniela Ramos, and Daniela's husband, Petitioner. (*Id.*). Yessica was in her room alone, but could hear Petitioner and Daniela arguing. (*Id.*). About "two minutes after the arguing," she then heard what sounded like a gunshot. (*Id.*). Yessica found Daniela on the laundry room floor with a wound in her rib area. (*Id.*). Yessica ran to get help and saw a vehicle leaving. (*Id.*). Yessica stated she believed that Petitioner was the person who drove away in the car. (*Id.*).[3]

A Hidalgo County Sheriff's Office Report contained further information from Yessica. (Dkt. No. 1-1 at 27-28 ("Detail Report")). In the police report, Yessica states that she heard Daniela and Petitioner "talking in the laundry room" and she heard Petitioner say "Daniela Calmate." (*Id.*). She then heard the sound of a gunshot from the laundry room; Yessica ran to the laundry room and found Daniela on the floor. (*Id.*). After the vehicle left the house, Yessica wanted to call an ambulance but before she could do so, Yessica received a call on her cell phone from Petitioner. (*Id.*). She asked Petitioner what happened—Petitioner responded instead that an ambulance was already on the way and hung up. (*Id.*).

Two additional individuals, Eunice Barrera and Laura Alvarez, provided statements describing Petitioner's conduct after the shooting. Eunice Barrera stated that Petitioner was a friend of her daughter, Laura Alvarez, and came to her house sometimes. (Dkt. No. 7-13 at 58-59 ("Affidavit")). Eunice stated that Petitioner had come over to her house a few times when upset and angry with his wife because his wife was jealous. (*Id.*). She stated that Petitioner came to her house on the night of the shooting, carrying a black handgun, and informed her that his wife shot herself out of jealousy. (*Id.*). When the police arrived, Eunice convinced Petitioner

---

[3] Yessica's testimony may not have been available had Petitioner gone to trial. Mr. Lopez's brief states that Yessica fled the jurisdiction as the trial date approached. (Dkt. No. 7-9 at 23).

to walk outside and meet them. (*Id.*). Petitioner told Eunice that he hid his gun in her laundry room basket. (*Id.*). Eunice gave this information to the sheriff's office, and the sheriff's office recovered the gun from the dirty laundry basket. (*Id.*).

Laura Alvarez stated that she is friends with Petitioner and that he has visited her house several times. (Dkt. No. 7-13 at 60-61). She stated that he usually talks about problems with his wife and how she is possessive. (*Id.*). Laura received a phone call from her mother on the night of the shooting, informing her that Petitioner was at their house saying that Daniela had shot herself. (*Id.*). Laura quickly returned home and asked Petitioner what happened. (*Id.*). Petitioner informed her that his wife shot herself and that he wanted Laura's help in getting away, offering her money in exchange for helping him "get away from here." (*Id.*). Laura declined the offer. (*Id.*). She questioned Petitioner as to why he had brought the gun with him, because if Daniela had really shot herself, he should have left it there. (*Id.*). Petitioner stated that he "just needed to get rid of the gun." (*Id.*). The sheriff's deputies arrived, and Laura convinced Petitioner to walk outside. (*Id.*).

The above describes behavior that would serve as circumstantial evidence of Petitioner's state of mind. "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977). "Analytically, flight is an admission by conduct." *Id.* "Its probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged

to actual guilt of the crime charged." *Id.* "The use of evidence of flight has been criticized on the grounds that the second and fourth inferences are not supported by common experience and it is widely acknowledged that evidence of flight or related conduct is 'only marginally probative as to the ultimate issue of guilt or innocence.' " *Id.* "It is the instinctive or impulsive character of the defendant's behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses. The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense." *Id.* at 1051; *see also United States v. Posey*, 611 F.2d 1389, 1391 (5th Cir. 1980) ("This attempt to bribe a government official in order to escape shortly after arrest was clearly admissible as evidence of guilt."); *United States v. Williams*, 775 F.2d 1295, 1300 (5th Cir. 1985) (defendant's move to Houston the day after the murder could have indicated a consciousness of guilt; trial court did not err in instructing jury to not place exclusive reliance on the flight and could consider possible innocent reasons for his actions.); *United States v. Murphy*, 996 F.2d 94, 97 (5th Cir. 1993) (court found that a flight instruction was proper for a defendant who hid in a closet when officers arrived).

In Petitioner's statement to police, he maintains that his flight from the house was for other reasons unrelated to the shooting. Petitioner initially told the police his name was Abel Javier Jaimes. (Dkt. No. 7-10 at 73-75 ("Hidalgo County Sheriff's Office Voluntary Statement of Accused")). Petitioner initially told "different versions of what happened." (*Id.* at 75). A Hidalgo County Sheriff's Office Supplemental Narrative report states that Petitioner said "Daniela was upset" because he had been talking on the phone to a woman. (Dkt. No. 7-12 at 97). Daniela got the gun from inside the house and "pointed it at him and told him she was going to kill him." (*Id.*). Petitioner told Daniela "to calm down, so then Daniela pointed the gun

towards her stomach and said she was killing herself and the gun went off." (*Id.*). "He did not know what to do and panicked so he picked up the gun and . . . left" to go to a friend's house. (*Id.*). He called 911 at the friend's house.[4] (*Id.*). After he was read his rights he "started by saying that his wife Daniela Ramos shot herself." (*Id.*). The report states that Petitioner "began to change his stories slightly little by little because he said that he was scared and confused about what had occurred." (*Id.*). Petitioner gave "different aliases" and Petitioner eventually stated that he "could have shot the gun by accident during [a] struggle." (*Id.*).[5]

Petitioner explained that he initially "lied to the police about who I was because I had been in jail before and I had a criminal history. I was mainly afraid of getting in trouble for having bought the .38 special pistol." (Dkt. No. 7-10 at 75). Petitioner stated that "what happened was just an accident. I never had the intention of killing my wife. I think Daniela was planning to commit suicide because she would hit herself on her face. She was too crazy." (*Id.*).

The trace evidence could corroborate his assertion that he lacked the necessary intent; it does not exclude that he did. As stated, Petitioner comes before the court on habeas review with a strong presumption of guilt. Petitioner does not show that the trace evidence report evidence

---

[4] Petitioner called an ambulance; he gave the name "Jorge Cepeda." (Dkt. No. 7-10 at 64-69 ("Transcript of 911 Call")). Petitioner reported that "Daniela Ramos" was "just a friend of her sister's [sic]" who had "found a weapon" and been "playing with" it and the weapon "went off by itself." (*Id.* at 65, 67-69). He states that he was only calling "because of her sister" who "asked me to do her a favor and that's why I'm calling you as an emergency." (*Id.* at 68-69). In his statement to police Petitioner states that he had called 911 because he wanted to help Daniela. (Dkt. No. 7-10 at 75).

[5] On this point, Petitioner argued in his state habeas petition that he should be guilty of manslaughter. (Dkt. No. 7-14 at 36, 63). His argument that the shooting was accidental, made in the same petition, is inconsistent with the argument that he should have been found guilty of manslaughter. Under Texas law, manslaughter is "recklessly" causing the death of an individual. Tex. Penal Code Ann. § 19.04(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." Tex. Penal Code Ann. § 6.03(c). In other words, Petitioner argues that he was aware of a substantial risk that could result from his conduct but consciously disregarded it.

would overcome the other circumstantial evidence of Petitioner's state of mind: the "two minutes" between the arguing and the gunshot, Petitioner's immediate flight from the house thereafter, concealment of the gun, use of a false name, his change of story, asserting that the primary reason for his flight after the shooting was because he was afraid of facing consequences for purchasing the gun, and offering money in exchange for helping him to flee the area.

Petitioner fails to show that, even if he had known of the trace evidence report and had proceeded to trial, there would have been a reasonable probability of a more favorable result, such that confidence in the outcome is undermined. In other words, Petitioner fails to meet his burden and demonstrate prejudice. For the above reasons, this claim should be dismissed.

## II.  <u>Knowing Guilty Plea</u>

Petitioner asserts that his trial counsel failed to inform him of the second ballistics report (trace evidence report) and/or "hid" this report from him. (Dkt. No. 1-1 at 4). Petitioner argues that if Mr. Lopez had informed him of the second ballistics report, Petitioner never would have pled guilty and would have proceeded to trial. (*Id.* at 5). Petitioner states that he seeks a new trial because his plea was not "knowing, voluntary, [and] intelligent." (Dkt. No. 1 at 7.). He argues that his "plea was not voluntary and intelligent because defense counsel did not have command of the facts [or] evidence of the case." (Dkt. No. 1-1 at 3). Mr. Lopez does not directly state that he did inform Petitioner of the trace evidence report, but does state that he "informed [Petitioner] of every single step of the investigation" and kept Petitioner "informed of all of [his] discoveries on the case." (Dkt. No. 7-9 at 19-21). Again, this claim was not presented in Petitioner's state habeas petition for Mr. Lopez to respond to.

Petitioner's claim is barred for failing to raise this claim in his state habeas petition. However, even if this claim was not procedurally barred, Petitioner would not be able to demonstrate that he is entitled to relief.

Petitioner cannot demonstrate his trial counsel's deficient performance.  Knowledge of the trace evidence report does not affect the validity of Petitioner's guilty plea.  "A guilty plea will be upheld on habeas review if entered into knowingly, voluntarily, and intelligently." *United States v. Hernandez*, 234 F.3d 252, 254 (5th Cir. 2000).  "To be knowing and intelligent, the defendant must have 'a full understanding of what the plea connotes and of its consequence.'" *Id.* at 255.  "The defendant need only understand the direct consequences of the plea; he need not be made aware every consequence that, absent a plea of guilty, would not otherwise occur." *Id.*   The law is far from requiring the defendant to know about the evidence gathered in the case in order to knowingly and intelligently plead guilty, although it may be helpful and informative in making his decision.  There is no basis to conclude that, even if he had not specifically discussed the trace evidence report with Petitioner, Mr. Lopez's actions rise to the level of deficient performance.

Furthermore, the record demonstrates that Petitioner was advised of the direct consequences of his plea and that his plea was knowingly given.  The transcript from September 8, 2015 shows that Petitioner was present and placed under oath. (Dkt. No. 7-8 at 5).  The court advised Petitioner of the range of punishment he faced. (*Id.* at 9).  The court advised Petitioner of the rights he would be giving up if he pled guilty. (*Id.* at 9-14).  The court asked if Petitioner went over the plea agreement and waiver of rights with his attorney before signing. (*Id.* at 12-13).  Petitioner answered in the affirmative. (*Id.*).  The court asked if Petitioner understood what he was signing. (*Id.*).  Petitioner answered in the affirmative. (*Id.*).  Petitioner then proceeded to

plead guilty. (*Id.* at 16). Statements made under oath in open court are entitled to a strong presumption of truthfulness. *United States v. Lampaziane*, 251 F.3d 519, 524 (5th Cir. 2001). Petitioner has not presented sufficient facts to overcome this presumption.

To show prejudice, Movant must show that, had his attorney made him aware of the trace evidence report, he would have chosen to go to trial instead of pleading guilty and had a reasonable probability of a more favorable result. *See Batamula*, 823 F.3d at 540. Petitioner alleges that, if he had known of the trace evidence report, he would not have pleaded guilty. In order to demonstrate prejudice, however, Petitioner must do more than simply aver he would have not pleaded guilty. *Id.*; *see Pilla*, 668 F.3d at 373 ("[Defendant] cannot [show prejudice] merely by telling us now that she would have gone to trial then if she had gotten different advice. The test is objective, not subjective[.]"). Petitioner has not demonstrated that the trace evidence report would have resulted in him deciding to proceed to trial and a reasonable probability of a more favorable result.

As discussed previously, Petitioner asserts that the shooting happened accidentally during a struggle for the gun. In light of the evidence surrounding Petitioner's behavior after the shooting, as discussed in Section I, Petitioner has not shown that he would have had a reasonable probability of a more favorable result at trial. Petitioner has failed to plead facts that demonstrate prejudice. This claim must be dismissed.

### III.   Ineffective Assistance for Failure to Hire Expert Witness

Petitioner argues that trial counsel was ineffective for failing to hire or consult with an expert witness regarding the two ballistics reports, the autopsy, the trajectory of the bullet, and a toxicology report on the deceased. (Dkt. No. 1 at 6; Dkt. No. 1-1 at 7). "The selection of an expert witness is a paradigmatic example of the type of strategic choic[e] that, when made after

thorough investigation of [the] law and facts, is virtually unchallengeable." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (internal quotations omitted). Again, even if Petitioner's claim were not procedurally barred, Petitioner's claim is without merit.

Petitioner relies on *Thomas v. Clements*, 789 F.3d 760, 769 (7th Cir. 2015), to support his argument. In *Clements*, the court's normal deference to counsel's strategic or tactical decisions was unavailable because counsel acknowledged that failing to consult an expert witness was not part of his strategy. *Id.* at 768. "[C]ounsel did not reach out to or even consider talking to a pathology expert to review Dr. Mainland's conclusion. . . . [C]ounsel admitted his failure to reach out to an expert was not a conscious decision—he just did not think to do so." *Id.*

Petitioner also relies on *Soffar v. Dretke*, 368 F.3d 441, 476 (5th Cir. 2004). In *Soffar*, the Fifth Circuit concluded that defense counsel had acted in an objectively unreasonable manner for failing to consult with a ballistics expert when "the State's theory relied heavily on ballistics evidence to show a correlation between the statement attributed to Soffar and the crime scene." *Id.* "[T]he State predominately relied on Soffar's self-incriminating statements despite his history of confessing to crimes he did not commit. This is particularly important when Soffar's statements conflict with the account given by . . . the sole witness to the crime" and when "an available qualified ballistics expert [could have testified] that only four shots were fired (not five as Soffar's statements purported to say), and that the arrangement of bullet holes in the carpet clearly showed that [victim] was shot in a different place from where he was found by police (and not where Soffar said he shot him)." *Id.* at 478-79. Ballistics evidence was both the cornerstone of the State's case and defense counsel's prime opportunity to shed significant doubt on the veracity of Soffar's confession.

The circumstances of Petitioner's case are far from those in *Clements* or *Soffar*. Trial counsel never acknowledged that his decision to not consult an expert witness was not strategic. The State's case against Petitioner did not turn on advanced ballistics evidence. Petitioner does not elaborate on how hiring an expert witness to review the autopsy, the bullet trajectory, or firearms and trace evidence report would have been helpful. Petitioner confessed to a version of events in which he and the victim struggled over a gun, and that the gun discharged accidentally while Petitioner was holding the gun by the grips. The premise of this ineffectiveness claim is that an expert witness would, in some way, be able support that he discharged the gun with a certain state of mind. Petitioner does not plead any facts to support this conclusory argument. Petitioner has not shown that trial counsel's choice to not hire an expert witness constitutes deficient performance.

Petitioner additionally asserts that an expert witness should have reviewed the toxicology reports on the victim. A toxicology done on the victim's blood revealed the presence of phentermine, a derivative of amphetamine which is used as an anorectic (loss of appetite) agent for weight loss. (Dkt. No. 1-1 at 38-39). Both Petitioner and Yessica stated that Daniela had been taking weight loss pills from Mexico. Yessica stated these pills made Daniela "moody" and "mad." (Dkt. No. 7-13 at 25). Petitioner points to the toxicology report which states that "adverse reactions to normal or elevated doses of phentermine include nervousness, tremor, confusion, headache, hallucinations[,] and psychotic episodes." (Dkt. No. 1-1 at 39). Petitioner argues that this evidence supports that the victim, Daniela, was the aggressor, corroborating his version of events in which Daniela found and pointed the gun at him and he struggled to take the gun away from her.

Even though trial counsel could have hired an expert witness to testify on the possible effects of taking phentermine, Petitioner has still not shown that his trial counsel's decision to not consult an expert was so unreasonable as to constituted deficient performance. Trial counsel averred that he had thoroughly gone through the evidence in the case, and provided specific detail about the adverse witness testimony that could have been used against Petitioner at trial. Given the evidence against Petitioner, it is not unreasonable that trial counsel did not pursue this avenue. As discussed in Section A, Yessica's statements already show that Petitioner and Daniela fought often and were arguing immediately before the shooting. Laura's and Eunice's statements also show that Petitioner and Daniela fought often. Even if Petitioner could show that the weight loss pills caused Daniela to act aggressively and initiate the confrontation, this is far from showing that this information would have led to a different result at trial. Again, a "reasonable probability" of a different result at trial is one great enough to "undermine confidence" in Petitioner's current conviction. *Strickland*, 466 U.S. at 694. The addition of expert testimony surrounding the phentermine is not sufficient to undermine confidence in Petitioner's conviction of first degree murder.

For these reasons, Petitioner has not demonstrated that trial counsel acted deficiently by failing to hire an expert witness to review the toxicology report. Petitioner has also not demonstrated that, had his counsel hired an expert witnesses, Petitioner would have proceeded to trial and had a reasonable probability of obtaining a more favorable result. Petitioner has failed to plead facts that demonstrate prejudice. For the above reasons, this claim should also be dismissed.

IV.   **Ineffective Assistance for Failure to Interview Witness**

Petitioner states that Mr. Lopez failed to interview the victim's sister, Yessica Ramos. (Dkt. No. 1-1 at 12). Petitioner asserts the sheriff's department manipulated Yessica Ramos into changing her statement, resulting in Yessica Ramos giving two conflicting statements—one stating Daniela's last words were "me di" ("I shot [did it to] myself") and one stating Daniela's last words were "mi dio" ("he shot [did it to] me"). (*Id.* at 12-13). Petitioner contends that, had Mr. Lopez investigated Yessica Ramos's two conflicting statements by interviewing her, Petitioner would not have pleaded guilty and insisted on going to trial. (*Id.* at 14). Petitioner additionally argues that by doing so Mr. Lopez could have sought a better plea bargain. (*Id.*). Again, even if Petitioner's claim were not procedurally barred, the claim is without merit.

The premise of Petitioner's claim is faulty. Yessica Ramos completed a sworn affidavit on the day of her sister's murder. (Dkt. No. 1-1 at 25). She stated that she was home with her sister, Daniela, and Daniela's husband, Petitioner. (*Id.*). She heard Petitioner and Daniela arguing. (*Id.*). About "two minutes after the arguing," she then heard what sounded like a gunshot. (*Id.*). Yessica found Daniela on the laundry room floor with a small hole in her rib area. (*Id.*). Daniela told her "me di, me di." (*Id.*). In the same affidavit, Yessica also stated "I didn't understand what she was saying." (*Id.*). Yessica ran to get a family friend and saw a vehicle driving away. (*Id.*). Yessica stated she believed that Petitioner was the person who drove away in the car and that she did not know if Petitioner owned a gun. (*Id.*).

A Hidalgo County Sheriff's Office Investigations Report stated that Yessica believed Daniela said "Medio, Medio." (Dkt. No. 1-1 at 26). A second police report provided more detail, stating that Yessica heard Daniela and Petitioner talking in the laundry room. (*Id.* at 27-28). Yessica heard Petitioner say Daniela's name. (*Id.*). Yessica heard the gunshot come from

the laundry room, and got up and ran to the laundry room. (*Id.*). Yessica found Daniela lying on the laundry room floor. (*Id.*). She asked Daniela what happened and "Daniela said, 'Medio' and she was trying to talk again and it sounded like 'Medi,' but then Daniela's neck, head, and jaw [were] twisting and I could not understand what she was trying to tell me again." (*Id.* at 27). Yessica ran to get help and when she came back Daniela was "still moving and twisting." (*Id.*). Yessica stated that she then received a call on her cell phone from Petitioner. (*Id.*). She asked Petitioner what happened—Petitioner responded instead that an ambulance was on the way and hung up. (*Id.*).

Trial counsel has an obligation to conduct a reasonable investigation, including interviewing key witnesses. "[T]his circuit has recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985). "The failure to interview eyewitnesses to a crime may strongly support a claim of ineffective assistance of counsel." *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (citing *Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982)). "Defense counsel is not required," however, "to investigate everyone whose name happens to be mentioned by the defendant." *Nealy*, 764 F.2d at 1178.

In the brief attached to his sworn affidavit, Mr. Lopez states that Yessica fled the jurisdiction as the trial date approached. (Dkt. No. 7-9 at 23). He did not state whether he had interviewed Yessica before she fled, whether he intentionally chose not to interview her, or whether he had intended to interview Yessica but was prevented from doing so by her disappearance. (*Id.*). He did not state whether any attempt was made to locate Yessica. (*Id.*).

Even if trial counsel had failed to take reasonable steps to locate and interview this witness and his actions constituted deficient performance, Petitioner has not pled facts that

demonstrate prejudice. Petitioner believes that Yessica's statement was manipulated by the police, and his suggestion is that a more thorough investigation by defense counsel would have revealed this. Petitioner's allegations have no factual support.

Had trial counsel interviewed or deposed Yessica, there is no basis to conclude that it would have led to a more favorable result at trial. As discussed previously, Petitioner asserts that the shooting happened accidentally during a struggle for the gun. Yessica did not witness the shooting. Even if Yessica had not fled the jurisdiction and she had been available to testify at trial or be deposed, she would not have been able to say whether there was a struggle over the gun or not. Fed. R. Evid. 602. Petitioner largely relies on Yessica's first affidavit taken on the day of the murder as the "truthful" version. In this affidavit, Yessica stated that "I didn't understand what [Daniela] was saying." (Dkt. No. 1-1 at 25). This is repeated in an additional police report which sought to clarify Daniela's last words, indicating that Yessica never fairly understood what Daniela had said because Daniela had great difficulty speaking after being shot. (*Id.* at 27-28). Yessica, again, stated that she could not understand what Daniela was trying to tell her. (*Id.*). The "conflict" in Yessica's statements is not what Petitioner asserts it to be.

Petitioner only *hopes* "me di" is what Yessica would have testified to—he does not know. There is no evidence that her testimony at trial would have supported his story. She may just as easily have insisted that Daniela said "me dio." The rest of Yessica's testimony could have been wholly detrimental. Her statements have included facts harmful to Petitioner's case, namely Petitioner's suspicious behavior after the shooting: that petitioner immediately fled after the shooting and immediately hung up the phone without responding to inquiries about what happened. She also stated that she did not hear the gunshot until "two minutes after the arguing." (Dkt. No. 1-1 at 25). In other words, Petitioner's argument is based on speculation that her

testimony would have been favorable. There is no indication that, had trial counsel interviewed Yessica, Petitioner would have proceeded to trial and had a reasonable probability of obtaining a more favorable result with her testimony. Petitioner has failed to demonstrate prejudice.

On Petitioner's secondary point, claiming that Mr. Lopez could also have obtained a better plea deal by investigating and exploiting the conflict in Yessica's statements, he has overstated the "conflict" in Yessica's statements. Yessica could not definitively say what Daniela's last words were. There is no "conflict" for defense counsel to exploit for a better plea deal. Furthermore, the prosecution would have had access to the same police reports that the defense did. There is no evidence to suggest that the prosecution did not already take into account the unknown element of Yessica's testimony during plea negotiations. Petitioner has no basis for assuming that Yessica's statements were not factored into the plea deal. There was no deficient performance, and there was no prejudice to Petitioner.

For the above reasons, this claim must be dismissed.

## V.   <u>Trial Court Denied Petitioner's Request for New Counsel</u>

Petitioner asserts that his Fifth and Sixth Amendment right to counsel was violated when the Texas trial court denied his request for substitute counsel on the date of trial. (Dkt. No. 1-1 at 15). The transcript of the September 8, 2015 proceedings shows that Petitioner asked the court for "an attorney from the Mexican consulate." (Dkt. No. 7-8 at 5-6). The court responded by saying "too late." (*Id.*). The court noted that he was represented by Mr. Lopez, and that Mr. Lopez was Petitioner's second attorney because he had substituted counsel once already. (*Id.*). The court noted that that day was the day of trial. (*Id.*). Petitioner responded that he did not want to "go to court" and the court responded that Petitioner did not "get to decide when" trial was. (*Id.*). Mr. Lopez stated he would explain it to Petitioner, and that although Petitioner was

going to trial against his advice, Mr. Lopez announced he was ready for trial. (*Id.*). After a brief

recess, Petitioner decided against going to trial and decided to plead guilty that day. (*Id.* at 7).

Once again, Petitioner failed to present this claim to the state court. Even if the claim

was not procedurally barred, Petitioner would not be able to demonstrate he is entitled to relief.

Petitioner does have a right to contact the Mexican consulate and, based on the exchange

in court, Petitioner was notified of this right. "The Vienna Convention on Consular Relations

requires an arresting government to notify a foreign national who has been arrested, imprisoned

or taken into custody or detention of his right to contact his consul." *Faulder v. Johnson*, 81

F.3d 515, 520 (5th Cir. 1996). Based on the fact that Petitioner asked for an "attorney," that his

§ 2254 claim emphasizes his desire to replace Mr. Lopez, and that he cites to the Fifth and Sixth

Amendments, it appears Petitioner may have conflated his "right to counsel" with his right to

contact a "consul" or the "consulate."

Although Article 36 gives consular officials the right to visit a detained national and to

"arrange for his legal representation," consular officials are not authorized to render legal

assistance. *See* Vienna Convention on Consular Relations art. 36(1)(c), Apr. 24, 1963, 21 U.S.T.

77, 596 U.N.T.S. 261. The U.S. Department of State notes that "[c]onsular officers may not act

as attorneys for their nationals." *See* U.S. Dep't of State, Bureau of Consular Affairs, Consular

Notification and Access 9 (2016).[6] The manual also recognizes potential confusion between the

terms "counsel" and "consul" or "consulate," stating in its FAQ section:

Q. How is a consular officer different from legal "counsel?"

---

[6] "The meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961); *United States v. Alvarado-Torres*, 45 F. Supp. 2d 986, 991 (S.D. Cal. 1999) (noting that consular officials are not authorized to render legal assistance according to the U.S. Department of State manual).

A. The term "consul" should not be confused with "counsel," which means an attorney-at-law authorized to provide legal counsel and advice. A foreign consular officer is not authorized to practice law in the United States.

*Id.* at 11.

Given Petitioner's insistence in his § 2254 petition that this denial violated his Fifth and Sixth Amendment right to counsel and that he wished to replace his trial attorney, Petitioner's claim is best construed as a request for substitute legal counsel, and not necessarily a request to contact the Mexican consulate.

"The right to counsel of one's choice is not absolute, and may under some circumstances be forced to bow to 'the general interest in the prompt and efficient administration of justice.' " *Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992). "The right to choose counsel may not be subverted to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice. It is a right and a proper tool of the defendant; it cannot be used merely as a manipulative monkey wrench." *Gandy v. Alabama*, 569 F.2d 1318, 1323 (5th Cir. 1978). "Due process demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his choice to prepare and conduct his defense." *Id.* A nonexhaustive list of seven factors are to be considered when a trial court is determining whether the defendant has had this "fair or reasonable opportunity" and deciding whether it should grant a continuance to obtain substitute counsel:

(1) the length of the requested delay; (2) whether the lead counsel has an associate who is adequately prepared to try the case; (3) whether other continuances have been requested and granted; (4) the balanced convenience or inconvenience to litigants, witnesses, opposing counsel and the court; (5) whether the requested delay is for a legitimate reason, or whether it is dilatory and contrived; (6) whether there are other unique factors present.

*Id.*

Petitioner asserts that the trial court failed to consider relevant factors, citing to *Cobb v. Warden*, a case which lists factors used in the Sixth Circuit for this same type of analysis. 466 F.

App'x 456, 460 (6th Cir. 2012). Fifth Circuit authority controls this court. Although the factors asserted by Petitioner do not apply, Petitioner would not have been entitled to substitute counsel under any set of factors.

Petitioner's last-minute request for new counsel is the quintessential abuse of the right which interferes with the prompt and fair administration of justice. Petitioner had already substituted counsel once. The indictment was filed July 30, 2014. (Dkt. No. 7-10 at 19). Trial was set for September 8, 2015. Petitioner had over a year to make arrangements for legal representation as he wished. The request for substitute counsel the day of trial was contrived; Petitioner expressed that he did not want to go to trial. Mr. Lopez was capable of trying the case, and announced that he was ready. "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). "In the Sixth Amendment context, last minute requests to retain new counsel are not only disfavored, but also routinely denied." *United States v. Smith*, 839 F.3d 456, 458 (5th Cir. 2016) (internal quotations omitted) (citing *United States v. Silva*, 611 F.2d 78 (5th Cir. 1980); *Newton v. Dretke*, 371 F.3d 250 (5th Cir. 2004)).

There is no basis to conclude that Petitioner's right to counsel was violated. For the above reasons, this claim should also be dismissed.

## CONCLUSION

### *Recommended Disposition*

After a careful review of the record and relevant law, the undersigned recommends that Movant's § 2254 motion be **DENIED** (Civ. Dkt. No. 1) and Respondent's motion for summary

judgment be **GRANTED** (Civ. Dkt. No. 8).  Finally, it is recommended that Movant's § 2254 motion be **DISMISSED** with prejudice, and the case be closed.

### *Certificate of Appealability*

It is recommended that the District Court deny a Certificate of Appealability.

Pursuant to 28 U.S.C. § 2253(c)(1)(A), the movant may not appeal the final order of a habeas corpus proceeding "unless the circuit justice or judge issues a certificate of appealability." The Rules Governing Section 2254 Proceedings instruct that the District Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, The Rules Governing Section 2254 Proceedings.  Because it is recommended that Movant's § 2254 motion be dismissed, it must be addressed whether he is entitled to a certificate of appealability (COA).

A movant is entitled to a COA when it can be shown that a reasonable jurist would find it debatable "whether the petition states a valid claim of the denial of a constitutional right" and "whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c).  Because the undersigned finds that Movant fails to meet this threshold, it is recommended that the District Court deny a COA.

Accordingly, Movant is not entitled to a COA.

### *Notice to the Parties*

Within fourteen days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations.  28 U.S.C. § 636(b)(1)(C); Federal Rules of Civil Procedure, Rule 72(b).  Failure to file written objections within fourteen days after service shall bar an aggrieved party from de novo review by the District Court on an issue

covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

The clerk of this court shall forward a copy of this document to the parties by any receipted means.

SIGNED this 15th day of July, 2018, at McAllen, Texas.

J. SCOTT HACKER
United States Magistrate Judge